McCARTHY *v.* BRONSON, WARDEN, ET AL.

No. 90–5635.   Argued March 25, 1991—Decided May 20, 1991

STEVENS, J., delivered the opinion for a unanimous Court.

*Christopher D. Cerf* argued the cause for petitioner. With him on the briefs was *Joel I. Klein.*

*Richard Blumenthal*, Attorney General of Connecticut, argued the cause for respondents. With him on the brief were *Aaron S. Bayer*, Deputy Attorney General, and *Steven R. Strom*, Assistant Attorney General.

JUSTICE STEVENS delivered the opinion of the Court.

In 1976, Congress authorized the nonconsensual referral to magistrates for a hearing and recommended findings "of prisoner petitions challenging conditions of confinement." 28 U. S. C. § 636(b)(1)(B).[1] We granted certiorari to decide whether that authorization includes cases alleging a specific

---

[1] Title 28 U. S. C. § 636(b)(1)(B) provides in relevant part:

"(b)(1) Notwithstanding any provision of law to the contrary—

.      .      .      .

"(B) a judge may . . . designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, . . . of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement."

138

episode of unconstitutional conduct by prison administrators or encompasses only challenges to ongoing prison conditions. 498 U. S. 1011 (1990).

In this case, petitioner brought suit against various prison officials alleging that, in violation of his constitutional rights, they used excessive force when they transferred him from one cell to another on July 13, 1982. App. 11–24. Petitioner waived a jury trial and initially consented to have a magistrate try the entire case pursuant to 28 U. S. C. § 636(c)(1).[2] See App. 7–8, 28–29. On the first day of trial, however, petitioner sought to withdraw his consent. Petitioner was permitted to withdraw his consent, but the Magistrate ruled that he was nonetheless authorized to conduct an evidentiary hearing and to submit proposed findings of fact and a recommended disposition to the District Court. See id., at 30–31.

After a hearing, the Magistrate recommended detailed findings and a judgment for defendants. Id., at 33–49. The District Court accepted the Magistrate's recommendation and overruled petitioner's objection to the Magistrate's role. Id., at 54–55. The Court of Appeals affirmed the District Court's determination that the Magistrate was authorized by § 636(b)(1)(B) to hold the hearing and to recommend findings. 906 F. 2d 835 (CA2 1990).

Petitioner contends that § 636(b)(1)(B) permits nonconsensual referrals to a magistrate only when a prisoner challenges ongoing prison conditions. Suits alleging that administrators acted unconstitutionally in an isolated incident, petitioner

---

[2] Title 28 U. S. C. § 636(c)(1) provides in relevant part:

"Notwithstanding any provision of law to the contrary—

"(1) Upon the consent of the parties, a full-time United States magistrate or a part-time United States magistrate who serves as a full-time judicial officer may conduct any or all proceedings in a jury or nonjury civil matter and order the entry of judgment in the case, when specially designated to exercise such jurisdiction by the district court or courts he serves."

suggests, are not properly classified as "petitions challenging conditions of confinement." § 636(b)(1)(B).

Petitioner advances two reasonable arguments for his construction of the statute. First, he maintains that the ordinary meaning of the words "conditions of confinement" includes continuous conditions and excludes isolated incidents. Second, he suggests that because a prisoner is constitutionally entitled to a jury trial in a damages action arising out of a specific episode of misconduct, it seems unlikely that Congress would authorize a nonconsensual reference to a magistrate in such a case. In our judgment, however, these arguments, although not without force, are overcome by other considerations.

We do not quarrel with petitioner's claim that the most natural reading of the phrase "challenging conditions of confinement," when viewed in isolation, would not include suits seeking relief from isolated episodes of unconstitutional conduct. However, statutory language must always be read in its proper context. "In ascertaining the plain meaning of [a] statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." *K mart Corp.* v. *Cartier, Inc.*, 486 U. S. 281, 291 (1988). See also *Crandon* v. *United States*, 494 U. S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy").

The text of the statute does not define the term "conditions of confinement" or contain any language suggesting that prisoner petitions should be divided into subcategories. On the contrary, when the relevant section is read in its entirety, it suggests that Congress intended to authorize the nonconsensual reference of *all* prisoner petitions to a magistrate. In pertinent part, the statute provides:

"(b)(1) Notwithstanding any provision of law to the contrary—

"(B) a judge may . . . designate a magistrate to conduct hearings, including evidentiary hearings, and to submit to a judge of the court proposed findings of fact and recommendations for the disposition, by a judge of the court, . . . *of applications for posttrial relief made by individuals convicted of criminal offenses and of prisoner petitions challenging conditions of confinement.*" § 636(b)(1)(B) (emphasis added).

This description suggests Congress intended to include in their entirety the two primary categories of suits brought by prisoners—applications for habeas corpus relief pursuant to 28 U. S. C. §§ 2254 and 2255 and actions for monetary or injunctive relief under 42 U. S. C. § 1983.

Petitioner attempts to bolster his plain meaning argument with the suggestion that this Court has interpreted the words "conditions of confinement" to include the limitation that he suggests. We certainly presume that in 1976, when Congress selected this language, our elected representatives were familiar with our recently announced opinions concerning prisoner petitions. See *Cannon* v. *University of Chicago*, 441 U. S. 677, 696–697 (1979). However, the possibility that Congress was influenced in its choice of language by our opinions cuts against, rather than in favor of, the statutory reading advanced by petitioner.

All but one of the cases that petitioner claims support his reading were decided well after the enactment of § 636(b)(1)(B). The sole case identified by petitioner that predates the statute's enactment did not even use the phrase "conditions of confinement" much less expound a narrow definition of it. See *Procunier* v. *Martinez*, 416 U. S. 396 (1974).

Just three years before the statute was drafted, however, our opinion in *Preiser* v. *Rodriguez*, 411 U. S. 475 (1973), had described two broad categories of prisoner petitions: (1) those challenging the fact or duration of confinement itself; and (2) those challenging the conditions of confinement. The statu-

tory language from § 636(b)(1)(B) that we emphasized above describes these same two categories. Significantly, our description in *Preiser* of the latter category unambiguously embraced the kind of single episode cases that petitioner's construction would exclude. We wrote:

"The respondents place a great deal of reliance on our recent decisions upholding the right of state prisoners to bring federal civil rights actions to challenge the conditions of their confinement. *Cooper* v. *Pate*, 378 U. S. 546 (1964); *Houghton* v. *Shafer*, 392 U. S. 639 (1968); *Wilwording* v. *Swenson*, 404 U. S. 249 (1971); *Haines* v. *Kerner*, 404 U. S. 519 (1972). But none of the state prisoners in those cases was challenging the fact or duration of his physical confinement itself, and none was seeking immediate release or a speedier release from that confinement—the heart of habeas corpus. In *Cooper*, the prisoner alleged that, solely because of his religious beliefs, he had been denied permission to purchase certain religious publications and had been denied other privileges enjoyed by his fellow prisoners. In *Houghton*, the prisoner's contention was that prison authorities had violated the Constitution by confiscating legal materials which he had acquired for pursuing his appeal, but which, in violation of prison rules, had been found in the possession of another prisoner. In *Wilwording*, the prisoners' complaints related solely to their living conditions and disciplinary measures while confined in maximum security. And in *Haines*, the prisoner claimed that prison officials had acted unconstitutionally by placing him in solitary confinement as a disciplinary measure, and he sought damages for claimed physical injuries sustained while so segregated. It is clear, then, that in all those cases, the prisoners' claims related solely to the States' alleged unconstitutional treatment of them while in confinement. None sought, as did the respondents here, to challenge the very fact or

duration of the confinement itself. Those cases, therefore, merely establish that a § 1983 action is a proper remedy for a state prisoner who is making a constitutional challenge to the conditions of his prison life, but not to the fact or length of his custody." *Id.*, at 498–499.

The denial of religious publications in *Cooper* v. *Pate*, 378 U. S. 546 (1964), the confiscation of legal materials in *Houghton* v. *Shafer*, 392 U. S. 639 (1968), and, most definitely, the placement of the prisoner in solitary confinement in *Haines* v. *Kerner*, 404 U. S. 519 (1972), were all challenges to specific instances of unconstitutional conduct, and the *Preiser* Court described them as challenges to "conditions of confinement."

Petitioner also claims that his narrow reading is supported by the fact that, in other legislation, Congress used the term "conditions of confinement" to mean ongoing situations.[3] However, the fact that Congress may have used the term "conditions of confinement" in a different sense in legislation having a different purpose cannot control our interpretation of the language in this Act that so clearly parallels our *Preiser* opinion.

The broader reading we adopt also comports with the policy behind the Act. The central purpose of the 1976 amendment to the Magistrate's Act was to authorize greater use of magistrates to assist federal judges "in handling an ever-increasing caseload." S. Rep. No. 94–625, p. 2 (1976). The adoption of the definition of "conditions of confinement" that

---

[3] See 18 U. S. C. § 4013(a)(4) (authorizing Attorney General to enter into contracts "to establish acceptable conditions of confinement" in state facilities housing federal detainees); 42 U. S. C. §§ 1997a(a), 1997c(a)(1) (authorizing Attorney General to initiate, or intervene in, injunctive actions challenging "egregious or flagrant conditions" in state prisons); 42 U. S. C. §§ 3769a(b), 3769b(a)(1) (requiring state governments to develop a "plan for . . . improving conditions of confinement" as a precondition to receiving federal funds to "reliev[e] overcrowding [and] substandard conditions").

we had used in *Preiser* is consistent with this purpose because it will allow referral of a broader category of cases. Our reading also furthers the policy of the Act because its simplicity avoids the litigation that otherwise would inevitably arise in trying to identify the precise contours of petitioner's suggested exception for single episode cases.

Petitioner's definition would generate additional work for the district courts because the distinction between cases challenging ongoing conditions and those challenging specific acts of alleged misconduct will often be difficult to identify. The complaint filed by petitioner in this case illustrates the point. On the one hand, he alleged that the defendants injured him by making improper use of a chemical agent "commonly referred to by correctional sadists as 'Big Red,'" App. 14, but on the other hand, he also complained of the absence of prison regulations governing the use of tear gas,[4] and sought injunctive relief[5] as well as damages. Thus, this complaint, like many other prisoner petitions, could fairly be character-

---

[4] "27. There is no standard reporting form for any chemical weapon other than mace used at [the Connecticut Correctional Institute at Somers, Connecticut (CCI-Somers)]." App. 15.

"30. There were no written directives governing the use of chemical weapons other than mace at the time this incident occurred." *Id.*, at 16.

"32. Written policy and procedure of the Department of Corrections and the Institution did not provide for the use of the tear gas duster." *Id.*, at 17.

"42. At the time of the incident, neither the Administrative Directives nor the CCI-Somers Operational Directives contained a use of force doctrine. Neither addressed the use of the tear gas duster or other chemical weapons, except mace." *Id.*, at 18.

[5] The complaint included a prayer for an injunction asking that defendants "immediately formulate and adopt rigid Directives restricting the use of Tear Gas and the weapon known as the Tear Gas Duster to riot situations involving multiple inmates or to situations where there exist barriers obstructing the use of mace[;] immediately formulate and adopt rigid Directives requiring the immediate post-incident treatment of inmates sprayed with tear gas including adequate medical treatment and shower facilities." *Id.*, at 23.

ized as challenging both ongoing practices and a specific act of alleged misconduct.

We are not persuaded to alter our reading of the statute by petitioner's argument based on the constitutional right to a jury trial. First, petitioner's statutory reading would not eliminate the potential constitutional difficulty that he identifies. Petitioner concedes that, in some actions that would be considered "petitions challenging conditions of confinement" under his definition, the prisoner would nonetheless have a constitutional right to a jury trial that would render nonconsensual referral constitutionally suspect. See Reply Brief for Petitioner 5, n. 3. Second, and, more important, the statute properly interpreted is not constitutionally infirm. No constitutional question arises in cases like this one, in which the plaintiff has waived the right to a jury trial. And, in cases in which the jury right exists and is not waived, the lower courts, guided by the principle of constitutional avoidance, have consistently held that the statute does not authorize reference to a magistrate. See, *e. g.*, *Hall* v. *Sharpe*, 812 F. 2d 644, 647–649 (CA11 1987); *Archie* v. *Christian*, 808 F. 2d 1132, 1135–1137 (CA5 1987) (en banc); *Wimmer* v. *Cook*, 774 F. 2d 68, 73–74 (CA4 1985).

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*